UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Brendan M. Shelley, being duly sworn, depose and state as follows:

**I. INTRODUCTION**

1. I am a Special Agent employed by the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE). I am assigned to ICE Homeland Security Investigations (HSI) – Washington, D.C. I have been employed as a Special Agent with ICE since October 2007. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the ICE Special Agent Training Program. My duties as a Special Agent for ICE include investigating administrative and criminal violations of the Immigration and Nationality Act, United States customs laws and other federal criminal violations to include wire fraud, bank fraud and money laundering. Prior to becoming a Special Agent, I was an ICE Management and Program Analyst with ICE's Office of the Principal Legal Advisor.

2. This affidavit is submitted in support of a criminal complaint and arrest warrant charging that from in or about February 2014 through in or about October 2014, within the District of Columbia and elsewhere, the defendant Sara Youssef Kassem, engaged in a conspiracy to violate Title 18, United States Code, Section 1956(h). Specifically, as set forth below, there is probable cause to believe that Kassem and others did knowingly and intentionally conspire with other persons known and unknown to knowingly conduct or attempt to conduct financial transactions with property representing the proceeds of specified unlawful activities knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful

1

activity in violation of 1956(a)(1)(B)(i) and that the criminally derived property involved in several of the individual transactions was of a value greater than $10,000 and was derived from specified unlawful activities in violation of 18 U.S.C. § 1957. Probable cause also exists to establish that the specified unlawful activities engaged in by Kassem and her co-conspirators include that 1) the co-conspirators willfully and knowingly devised a scheme to obtain money and property by means of false pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud, knowingly and intentionally caused to be transmitted by means of wire in interstate commerce writings, signs, and signals for the purpose of executing such scheme and artifice to defraud in violation of Title 18 United States Code, Section 1343; and 2) the defendants knowingly and willfully carried out a scheme to obtain money or property owned by or under the custody and control of Bank of America for the benefit of the Kuwaiti Health Ministry by false and fraudulent pretenses in violation of Title 18 United States Code, Section 1344(2).

3. This affidavit is based on my personal observations during the course of this investigation, information conveyed to me by other law enforcement officials, my review of records, documents and other physical evidence obtained during this investigation and interviews of witnesses. This affidavit contains information necessary to support a finding of probable cause, but does not include each and every fact observed by me or known by the government.

## II. THE DEFENDANT

4. According to immigration records, Sara Youseff Kassem is a 20-year-old female who was born in Lebanon. According to witness statements described below, Kassem is known to be in a personal relationship with Unindicted Co-Conspirator 1 (UCC-1) with whom she resided at 22 Kincaid Lane, Stafford, Virginia. The location of her residence is corroborated by

records of Bank of America indicating that she opened an account on or about April 4, 2014 and listed the address of 22 Kincaid Lane, Stafford, Virginia. According to immigration records Kassem entered the United States on or about August 12, 2003 on a B1/B2 Non-Immigrant Visa. According to immigration records, Kassem overstayed her visa in violation of the Immigration and Nationality Act. These same immigration records indicate that Kassem subsequently applied for Deferred Action for Childhood Arrivals (DACA). Kassem was granted DACA through June 18, 2015. According to law enforcement databases, Kassem has two vehicles registered to her at 22 Kincaid Lane, Stafford, Virginia. Kassem has listed the address of 323A Wallace Lane, Fredericksburg, Virginia on applications for at least one bank account.

### III.  BACKGROUND INFORMATION

5.      According to open sources, the State of Kuwait operates embassies throughout the world, including an embassy located in Washington, D.C. The Embassy of Kuwait in Washington, D.C. operates the Kuwait Embassy Health Ministry (also known as the Kuwait Health Office, also known as the Kuwait Health Division, herein referred to as Heath Ministry). The Health Ministry is located at 4301 Connecticut Avenue, NW, Suite 330 in Washington, D.C.

6.      According to open sources and a witness interview described below, the mission of the Health Ministry is to pay for health care costs incurred by Kuwaiti nationals receiving medical treatment in the United States. Kuwaiti citizens requiring medical attention sometimes travel to foreign countries in order to receive medical attention. The Health Ministry's core responsibilities are to 1) coordinate care provided by medical service providers, 2) arrange for medical care providers to be paid with government funds for services provided, and 3) pay patients and their families a bi-weekly stipend for travel and living expenses. All expenses associated with the operation of the Health Ministry are paid for by the Government of Kuwait.

7.   According to interviews of a witness and other evidence described below, in 2014, the Health Ministry office located in Washington, D.C. was overseen by a Senior Health Ministry official and a Financial Attaché Hanan Al Sharaf.

8.   According to Bank of America records, the Health Ministry has maintained a Bank of America bank account in Washington, D.C. for at least two years, including throughout 2014. The account is funded each month by wire transfers originating from the Kuwaiti government.

## IV. THE CONSPIRACY

9.   As set forth in this affidavit, there is probable cause to believe that the co-conspirators identified herein, including Kassem, knowingly conspired to enrich themselves by embezzling funds from the Bank of America bank account owned by the Kuwaiti government's Health Ministry.

10.   The ways, manner and means by which the conspiracy was carried out included the following:

   a. It was part of the conspiracy that members of the conspiracy would use checks drawn on the Health Ministry's bank account in order to make unauthorized payments to companies that did not provide any services (the "shell companies").

   b. It was further part of the conspiracy that members of the conspiracy would create shell companies, using names that closely resembled actual health care providers to make them appear legitimate, in order to conceal embezzlement activity.

   c. It was further part of the conspiracy that members of the conspiracy would open bank accounts for the shell companies to deposit checks payable to the shell companies drawn on the Health Ministry funds in order to conceal and embezzle funds.

   d. It was further part of the conspiracy that members of the conspiracy would transfer embezzled funds from the shell company accounts to the bank

4

    accounts of other members of the conspiracy, and distribute embezzled funds in cash payments.

   e. It was further part of the conspiracy that members of the conspiracy would access transaction records of the Health Ministry, including invoices and payment records, in order to edit information associated with prior payments.

11. As set forth in this affidavit, more than sufficient probable cause exists to believe that the co-conspirators agreed to embezzle approximately $2 million in Health Ministry Funds. The financial records reviewed to date reveal that at least $1.3 million was paid by the Health Ministry to the co-conspirators through shell companies.

12. As set forth below, there is more than sufficient probable cause to believe that Kassem's role in the conspiracy included, among other things, receiving and depositing checks issued by a shell company in whose name money would be fraudulently diverted from the Ministry of Health. Such checks identified to date include four checks payable to her and drawn on a shell company that were deposited into her personal account on three different occasions from in or about March 2014 through in or about April 2014 totaling $26,400.

## V. PROBABLE CAUSE

### A. INFORMATION PROVIDED BY SOURCE OF INFORMATION 1

13. In November 2014, ICE HSI was contacted by a source of information (herein referred to as SI-1) concerning suspected embezzlement activity at the Kuwait Health Ministry in Washington, D.C. SI-1 was previously employed as an accountant with the Health Ministry from approximately June 2013 until September 2014. SI-1 stated SI-1 had knowledge of Health Ministry employees who were embezzling Health Ministry funds and laundering the stolen money using various shell corporations.

14. On November 3, 2014 and again on February 26, 2015, I interviewed SI-1. SI-1 stated in sum and in substance:

5

    a. SI-1 was previously employed by the Health Ministry from approximately June 2013 until September 2014;

    b. SI-1 reported to the Finance Attaché, Hanan Al Sharaf;

    c. the mission of the Health Ministry is to pay for the health care costs incurred by Kuwaiti nationals receiving medical treatment in the United States;

    d. it was not uncommon for Kuwaiti nationals to travel to foreign countries, including the United States, in order to receive medical treatment;

    e. Kuwait operates health ministries in several foreign countries, including the United States;

    f. Kuwaiti nationals seeking medical attention in the United States work with the Health Ministry to prepare a letter guarantying payment of expenses for treatment of the person to be issued to the hospital providing the medical care;

    g. the hospitals bill the Health Ministry directly;

    h. the Health Ministry pays the hospital with funds provided by the Kuwaiti government;

    i. all payments for medical care are paid with funds from the Health Ministry's bank account;

    j. the Health Ministry's bank account is funded each month with a wire transfer from the Government of Kuwait;

    k. the wire transfers typically range from $25 million to $30 million dollars each month, but additional funds can be wired depending on the number of people needing medical assistance or other expenses;

    l. the Health Ministry maintains a bank account at a Bank of America branch located in the Van Ness neighborhood of Washington, D.C.;

    m. Health Ministry employees are paid by check from the Health Ministry's Bank of America bank account;

    n. SI-1 was originally hired to work at the Health Ministry as an accountant and was later tasked by Al Sharaf with conducting an audit of the Health Ministry's expenses;

    o. during SI-1's audit, SI-1 noticed the Health Ministry's computerized accounting system allowed users to manually edit information associated with

previous transactions including a patient's name, the date of a payment, the payee's information and the amount of money paid;

p. SI-1 was concerned that individuals with access to the accounting system could conceal embezzlement activity by manipulating the information associated with the transactions;

q. SI-1 reported SI-1's concerns to a Senior Health Ministry official and Al Sharaf;

r. Al Sharaf subsequently hired UCC-1 as an accountant;

s. prior to the hiring of UCC-1, Health Ministry checks were maintained in a central location in order to prevent unauthorized payments from being made;

t. UCC-1 removed the controls on the Health Ministry checks. After UCC-1 was hired, blank Health Ministry checks were not held in a central place but were generally accessible to employees;

u. SI-1 became aware in 2014, that numerous accusations, including accusations made by the Senior Health Ministry official, were made that Al Sharaf and UCC-1 were involved in embezzlement activity;

v. UCC-1 admitted orally to SI-1 to conspiring with others, including Al Sharaf, to embezzle money from the Health Ministry;

w. UCC-1 wrote a statement in which UCC-1 admitted to embezzling funds with Al Sharaf and others from the Health Ministry and gave a copy of the written statement to SI-1. SI-1 understood that the statement was requested by a Senior Health Ministry official;

x. SI-1 witnessed UCC-2 also prepare a written statement in which UCC-2 stated he had knowledge of UCC-1 operating UPMC, Hopiken and Med Star—the shell companies, among other things. SI-1 signed this statement as a witness;

y. Al Sharaf instructed SI-1 to call UCC-1 from his cell phone while in the Health Ministry Office, located in Washington, D.C. Al Sharaf then took the phone and placed it in speaker mode. SI-1 heard Al Sharaf ask UCC-1 for "the documents;"

z. SI-1 said that shortly thereafter, he, and to his knowledge UCC-1 and UCC-2, were all terminated from their employment in or about September 2014. SI-1 also believes that Al Sharaf was terminated as the Financial Attaché;

aa. SI-1 said he knew that UCC-1 had a personal relationship with and may be married to a young woman.

7

15. At the conclusion of the interview on November 3, 2014, SI-1 provided me with several documents, many of which were written in Arabic. One of the documents was a written statement dated September 17, 2014 which appeared to be signed by UCC-1. SI-1 advised me that this is a copy of the written statement that he saw UCC-1 author. One of the documents was a written statement dated September 12, 2014 which appeared to be signed by UCC-2, a Health Ministry employee. SI-1 advised me that this is a copy of the statement he observed UCC-2 writing, and saw him sign in the offices of the Health Ministry.

16. On February 26, 2015, SI-1 correctly identified photographs of Al Sharaf, UCC-1, and UCC-2 after being shown headshot photographs, including a known photo of UCC-1 and a known photo of UCC-2 and several others persons.

B. INFORMATION CONTAINED IN THE STATEMENT OF UCC-1

17. I requested translators assigned to the U.S. Citizenship and Immigration Services Language Services Section translate the various documents previously provided by SI-1. Based on my review of the certified translations of the documents, identified as the written statement of UCC-1, UCC-1 dated September 15, 2014, stated in sum and in substance:

    a. UCC-1 had previously discussed an agreement with Al Sharaf under which UCC-1 would leave the Health Ministry so UCC-1 could open a business that would provide the Health Ministry with medicines;

    b. Al Sharaf advised UCC-1 that UCC-1 could sell medicines while continuing to work at the Health Ministry;

    c. Al Sharaf told UCC-1 that they (UCC-1 and Al Sharaf) could split any profits equally;

    d. Al Sharaf wanted to make sure her name was not mentioned in any transactions so her involvement would not be known to third parties;

e. UCC-1 was directed by Al Sharaf to prepare invoices for services that were not provided to the Health Ministry and to issue checks in the name of third parties. Several of their conversations about this were conducted by writing on yellow paper, because according to UCC-1, she thinks her offices are under surveillance;

f. Al Sharaf wanted UCC-1 to provide her with $2 million dollars through the embezzlement scheme;

g. UCC-1 and Al Sharaf agreed Al Sharaf would receive $1 million in cash;

h. UCC-1 and Al Sharaf agreed to establish shell companies and to create fictitious bills from the shell companies to the Health Ministry;

i. UCC-1 and Al Sharaf agreed even though bills would be sent to the Health Ministry, no actual services would be provided;

j. UCC-1 was not afraid of getting in trouble because UCC-1's partner in the scheme was UCC-1's superior and the person who approved payments and signs checks;

k. the first shell company (MedStar) received approximately $200,000.00 in payments from the Health Ministry;

l. the second shell company (Hopiken) received approximately $300,000.00 in payments from the Health Ministry;

m. the third shell company (BMC, known to law enforcement as UPMC) received approximately $400,000.000 in payments from the Health Ministry;

n. Al Sharaf went on vacation in September 2014;

o. when Al Sharaf returned from her vacation, she wanted to know who signed the checks in her absence, to which UCC-1 replied that another Senior Health Ministry official did;

p. UCC-1 asked Al Sharaf how she wanted her money, to which Al Sharaf replied she would tell UCC-1 later;

q. Al Sharaf asked for copies of those checks signed by another Senior Health Ministry official. UCC-1 stated that Al Sharaf told him that a committee from the Ministry would be arriving and that the situation had changed;

r. in or about September 2014, UCC-1 learned employees of the Health Ministry were under investigation by the Kuwaiti government for embezzlement;

s. Al Sharaf tried to insinuate UCC-1 implicated her (Al Sharaf) in the embezzlement scheme by having her sign the checks issued to the shell companies;

    t. UCC-1 gave UCC-2 eight pre-signed but blank checks from a shell company to give to Al Sharaf. UCC-1 advised UCC-2 that "the whole amount was not there" because people had taken their money and left;

    u. A committee from the Kuwaiti government arrived to investigate the embezzlement in or about September 2014;

    v. After the committee arrived, UCC-1 went to a Senior Health Ministry official and confessed to UCC-1's and Al Sharaf's involvement in the embezzlement scheme;

    w. Al Sharaf directed other Health Ministry employees to attempt to conceal her involvement in the scheme by changing payment information. Al Sharaf also instructed UCC-1 on what to say to the committee.

  C. INFORMATION CONTAINED IN THE STATEMENT OF UCC-2

18. Based on my review of a document previously identified as the written statement of UCC-2 dated September 12, 2014, the document stated in sum and in substance:

    a. UCC-2 was employed at the Health Ministry in 2014;

    b. UCC-2 obtained a position at the Health Ministry through UCC-1, who was a family friend;

    c. UCC-1 showed UCC-2 how to create fake invoices and how to steal money using the "KT" system (known to law enforcement as the Health Ministry's accounting system) but UCC-2 stated that UCC-2 stepped away and refused to help;

    d. UCC-1 asked UCC-2 to show him how to incorporate companies with names similar to companies that provided legitimate services to the Health Ministry;

    e. UCC-2 confirmed that UCC-1 operated shell companies with names that resembled legitimate healthcare providers;

    f. on Monday, September 8, 2014 at approximately 10:00 AM, Al Sharaf came to UCC-2's desk and instructed UCC-2 to call UCC-1 on UCC-2's cellular telephone;

    g. UCC-2 placed a call to UCC-1 and handed the phone to Al Sharaf;

    h. Al Sharaf told UCC-2 that she wanted UCC-2 to serve as a witness for the duration of the phone call;

    i. During the phone call, Al Sharaf screamed at UCC-1 to get the "stuff" and told UCC-1 to close the "deal" peacefully;

10

j. Al Sharaf threatened to call the Embassy and the State Department if UCC-1 did not get "the stuff;"

k. Al Sharaf stated to UCC-2 that UCC-1 made a mistake at work and that she was trying to help UCC-1 fix the mistake by returning money;

l. UCC-2 believed Al Sharaf was trying to hide something;

m. UCC-2 then spoke with UCC-1, who told him he would return the checks, but that most of the checks had already been cashed and that UCC-2 should tell Al Sharaf that;

n. Outside of the office, UCC-1 told UCC-2 that UCC-1 had made an arrangement with Al Sharaf and that UCC-1 and Al Sharaf had previously negotiated percentages and methods by which Al Sharaf would receive money from UCC-1;

o. after the phone call referenced above, on September 8, 2014, UCC-1 provided UCC-2 with 8 pre-signed blank checks from accounts in the name of one or more shell companies, and an envelope containing more checks;

p. UCC-2 took a picture of at least one check without UCC-1 noticing;

q. on Tuesday, September 9, 2014, UCC-2 provided the checks he received from UCC-1 to Al Sharaf who instructed him to deposit the checks;

r. Al Sharaf stated she wanted to resolve this matter without anybody asking any questions;

s. UCC-2 identified UPMC Global Services Inc, MedStar Physician LLC and Hopiken Medical LLC as companies owned and operated by UCC-1.

D. STATEMENTS MADE TO LAW ENFORCEMENT AGENTS BY CO-CONSPIRATOR HANAN AL SHARF

19.  Hanan Al Sharaf was charged in a one count complaint with engaging in the same conspiracy involving Walid Aly and others named herein.

20.  Upon arrest, after Al Sharaf was advised of her rights under *Miranda*, she made voluntary statements to law enforcement agents including the undersigned. She stated in sum and substance that UCC-1 and UCC-2, both of whom she described as employees whom she

11

supervised, stole money from the Health Ministry by writing checks to fake companies. She said that the checks were issued to companies that were controlled by UCC-1 and UCC-2. According to Al Sharaf, UCC-1 and UCC-2 named the companies they controlled names that closely resembled legitimate service provider. Al Sharaf suspected UCC-1 and UCC-2 of manipulating information in the Health Ministry's accounting system in conjunction with the payment of Health Ministry funds to the shell companies.

21.     However, Al Sharaf also denied her involvement and that she received any benefits from the scheme.

E.  IDENTIFICATON OF SHELL COMPANIES INVOLVED IN POSSIBLE EMBEZZLMENT ACTIVITY

22. In connection with this investigation, I conducted a search of the Virginia State Corporation Commission's (SCC) online database. A search for UPMC Global Services revealed a record for UPMC Global Care LLC with SCC identification number S5143021. Records checks revealed UPMC Global Care LLC is a limited liability company incorporated in the state of Virginia. The date of formation and registration is listed as July 9, 2014. The principal office is a residence located at 22 Kincaid Lane, Stafford, Virginia, which was the address of Kassem and UCC- 1. UCC-2 is listed as the organizer and registered agent of UPMC Global Care LLC.

23. A search for Hopiken Medical in the Virginia SCC online database revealed a record for Hopiken Medical Service INT LLC with SCC identification number S5231164. Records checks revealed Hopiken Medical Service INT LLC is a limited liability company incorporated in the state of Virginia. The date of formation and registration is listed as September 9, 2014. The principal office is a residence known to law enforcement in Lorton, Virginia, which is

believed to be the address of an individual known to the government as Unindicted Co-Conspirator 3 (herein referred to as UCC-3). The registered agent is listed as UCC-3.

24. A search for Hopiken Medical revealed a record for Hopiken Medical Service, LLC with department identification number W15759335. Records checks revealed Hopiken Medical Service, LLC is a limited liability company incorporated in the state of Maryland. The date of formation and registration is listed as March 20, 2014. The principal office is located in Baltimore, Maryland. The registered agent is listed as an individual who is known to the government as Unindicted Co-Conspirator 4 (herein referred to as UCC-4). A review of the Articles of Incorporation indicates Hopiken Medical Service LLC was formed to provide medical transportation services.

25. On February 18, 2015, I received and subsequently reviewed the Articles of Organization for Hopiken Medical Service INT LLC from the Virginia SCC. The Articles of Organization identified UCC-3 as the resident agent of Hopiken Medical Service INT LLC. The Articles of Organization indicated Hopiken Medical Service INT LLC's registered office is located in Lorton, Virginia, which is the residence address of UCC-3.

26. On February 19, 2015, I conducted a search of the Maryland Department of Assessments and Taxation Business Services online database. A search of UPMC Global Services revealed a record for UPMC Global Services LLC with department identification number W16035115. Records checks revealed UPMC Global Services LLC is a limited liability company incorporated in the state of Maryland. The date of formation and registration is listed as August 18, 2014. The principal office is located in Silver Spring, Maryland, which is believed to be the residence of an individual known to the government as Unindicted Co-Conspirator 5 (herein referred to as UCC-5). The registered agent is listed as UCC-5.

27. In the course of the investigation, I conducted a search of the Maryland Department of Assessments and Taxation Business Services online database, which revealed a record for Med Star Physician LLC. Records checks revealed Med Star Physician LLC is a limited liability corporation incorporated in the state of Maryland. The principle office is located in Baltimore, Maryland. A review of the Articles of Organization indicates that Med Star Physician LLC was formed to provide transportation services.

## F.  REVIEW OF BANK RECORDS ASSOCIATED WITH BANK OF AMERICA ACCOUNT NUMBER XXXXXX0454

28. On December 15, 2014, I subpoenaed bank records associated with Bank of America bank account number XXXXXX0454. Bank of America bank account number XXXXXX0454 is identified as being associated with the Kuwait Health Office, Embassy of Kuwait. A review of records associated with the account revealed the Health Ministry is located at 4301 Connecticut Avenue, NW, Suite 300 in Washington, D.C. a Senior Health Ministry official and Hanan Sharaf (Deputy Health Attaché for Finance) were identified as signatories on the account.

29. SI-1 has stated that UCC-1 and UCC-2 were employed by the Health Ministry. A review of the checks issued from the Health Ministry's bank account corroborates that fact, as checks in similar amounts are issued to these individuals on a bi-weekly basis.

30. A review of checks authorizing payment from the Health Ministry's bank account revealed payments to the following entities:

    a. MedStar Physician LLC – Baltimore, Maryland

    b. UPMC Global Service – Baltimore, Maryland

    c. Hopiken Medical Services – Baltimore, Maryland

      d.  MedStar Health TS – Baltimore, Maryland

      e.  Hopiken Medical Services Int – Baltimore, Maryland

31. A review of payments originating from the Health Ministry's Bank of America bank account to established health care providers revealed payments to Johns Hopkins Medicine, MedStar and UPMC Global Care. A review of the address information associated with these payments, and open source public information, indicates Johns Hopkins Medicine, MedStar and UPMC Global Care are established entities that provide legitimate medical services.

32. The Bank of America bank account records reviewed to date revealed that several checks issued by the Kuwait Health Ministry were deposited in accounts opened in the name of the shell companies.

G.  REVIEW OF BANK RECORDS ASSOCIATED WITH THE SHELL COMPANIES

33. According to a review of bank records from Wells Fargo, an account was opened in or about March 2014 at Wells Fargo Bank in the name of Hopiken Medical Service Int. The signatory on the account is UCC-3. The address given for the companies is an address known to law enforcement in Lorton, Virginia, which is the same address that the bank listed on the account statements, and is the reported residence address for UCC-3.

34. The following list contains a sample of payments made from the Kuwaiti Health Ministry to Hopiken Medical Services during the period from at least February 2014 to August 2014 during the conspiracy:

| Date (On or About) | Account Holder | Amount |
|---|---|---|
| 2/24/14 | Hopiken Medical Services | $8,766.40 |
| 2/24/14 | Hopiken Medical Services | $9,074.60 |
| 2/24/14 | Hopiken Medical Services | $9,140.70 |
| 2/24/14 | Hopiken Medical Services | $9,993.85 |
| 3/13/14 | Hopiken Medical Services | $12,657.00 |
| 4/8/14 | Hopiken Medical Services | $13,375.62 |

| | | |
|---|---|---|
| 4/8/14 | Hopiken Medical Services | $11,375.62 |
| 4/8/14 | Hopiken Medical Services | $9,860.62 |
| 8/8/14 | Hopiken Medical Services | $57,483.25 |
| 8/8/14 | Hopiken Medical Services | $53,483.25 |
| 8/9/14 | Hopiken Medical Services | $59,483.25 |

35.     A review of the Wells Fargo bank records for the account opened in the name of Hopiken Medical Services Int. revealed that checks drawn on this shell company account were in turn deposited into the accounts of other members of the conspiracy, including an account at Bank of America held in the name of Kassem.  This account was numbered XXXXXXXX2219.  It was opened by Kassem on or about April 4, 2014 and closed on July 3, 2014.  The mailing address for the account was 22 Kincaid Lane, Stafford, Virginia.  The following list contains a sample of payments made from Hopiken Medical Services to accounts controlled by Kassem, including the Bank of America account. Each check is endorsed with a unique signature which closely resembles her signature on her driver's license issued by the state of Virginia.

| Date of Check (On or About) | Amount | Deposit Bank | Payee |
|---|---|---|---|
| March 27, 2014 | $4,000 | Bank of America | Kassem (linked to UCC-1) |
| April 1, 2014 | $6,500 | Bank of America | Kassem (linked to UCC-1) |
| April 18, 2014 | $6,900 | Unknown | Kassem (linked to UCC-1) |
| April 18, 2014 | $9,000 | Unknown | Kassem (linked to UCC-1) |

36.     A review of the Wells Fargo bank records for the account opened in the name of Hopiken Medical Services Int. revealed that checks drawn on this shell company account were in turn deposited into the accounts of UCC-1 who is known to be in a personal relationship with Kassem:

| Date (On or About) | Amount | Payee |
|---|---|---|

| Date (On or About) | Amount | Payee |
|---|---|---|
| April 16, 2014 | $7500 | UCC-1 |
| April 23, 2014 | $8648 | UCC-1 |

37.    According to the Wells Fargo bank records of the Hopiken Medical Services Int account, UCC-3 also withdrew cash from the account on the following dates in the following amounts:

| Date (On or About) | Amount |
|---|---|
| March 21, 2014 | $2,000 |
| March 21, 2014 | $5,000 |
| March 25, 2014 | $5,000 |
| March 26, 2014 | $1,000 |
| April 2, 2014 | $4,000 |
| April 4, 2014 | $1,400 |
| April 16, 2014 | $2,000 |
| April 17, 2014 | $1,400 |
| April 18, 2014 | $8,000 |
| August 14, 2014 | $3,000 |
| August 14, 2014 | $38,000 |
| August 14, 2014 | $38,000 |
| August 15, 2014 | $1,000 |
| August 21, 2014 | $24,000 |
| August 22, 2014 | $4,000 |
| August 28, 2014 | $5,000 |
| August 29, 2014 | $5,000 |
| September 2, 2014 | $9,469 |
| September 8, 2014 | $47,796.74 |

38.    The following list contains a sample of payments made from the Kuwaiti Health Ministry to MedStar Health Services and MedStar Physician LLC.  The latter is the shell company described in paragraph 18 above, and we have not identified official corporate records for MedStar Health Services.  These payments were made during the period from at least March 2014 to August 2014 during the conspiracy:

17

| Date (On or About) | Account Holder | Amount |
|---|---|---|
| 3/5/14 | MedStar Health TS | $8,588.06 |
| 5/5/14 | DBA MedStar Health TS | $48,187.50 |
| 5/5/14 | DBA MedStar Health TS | $42,187.50 |
| 5/5/14 | DBA MedStar Health TS | $38,187.50 |
| 6/30/14 | DBA MedStar Health TS Serves | $38,000.00 |
| 8/19/14 | MedStar Physician LLC | $56,904.80 |
| 8/19/14 | MedStar Physician LLC | $64,227.21 |
| 8/19/14 | MedStar Physician LLC | $84,452.90 |
| 8/19/14 | MedStar Physician LLC | $72,815.31 |

39.     According to bank records from Wells Fargo, UCC-3 also opened a bank account in the name of MedStar Health Services.  The signatory on the account was UCC-3.  The address given for the company was an address known to law enforcement in Lorton, Virigina, which is the same address that was listed on the statements for this account.  According to the Wells Fargo records, UCC-3 wrote at least the following checks from the MedStar Health Services bank account to UCC-1:

| Date (On or About) | Amount | Payee |
|---|---|---|
| August 2, 2014 | $4,000 | UCC-1 |
| August 2, 2014 | $6,000 | UCC-1 |
| August 2, 2014 | $6,000 | UCC-1 |

40.     According to Wells Fargo bank account records reviewed to date, UCC-3 withdrew money from the MedStar Health Services account on the following dates:

| Date (On or About) | Amount |
|---|---|
| May 13, 2014 | $15,000 |
| May 20, 2014 | $2,000 |
| July 7, 2014 | $1,100 |
| July 14, 2014 | $2,300 |
| July 17, 2014 | $2,000 |
| July 18, 2014 | $9,000 |
| July 21, 2014 | $9,000 |
| July 29, 2014 | $5,000 |
| August 1, 2014 | $5,000 |

18

| Date (On or About) | Amount |
|---|---|
| August 6, 2014 | $1,000 |
| August 7, 2014 | $5,000 |
| August 11, 2014 | $1,000 |
| August 11, 2014 | $4,000 |
| August 28, 2014 | $2,000 |
| September 2, 2014 | $5,000 |

41. The following list contains a sample of payments made from the Kuwaiti Health Ministry to UPMC Global, a shell company described in paragraph 18 above, for which UCC-2 is listed as the registered agent and organizer, in August 2014 during the conspiracy:

| Date (On or About) | Account Holder | Amount |
|---|---|---|
| 8/1/14 | UPMC Global Service | $57,860.15 |
| 8/1/14 | UPMC Global Service | $53,184.25 |
| 8/5/14 | UPMC Global Service | $50,566.75 |
| 8/5/14 | UPMC Global Service | $53,690.25 |
| 8/5/14 | UPMC Global Service | $42,087.80 |
| 8/8/14 | UPMC Global Service | $58,483.25 |
| 8/8/14 | UPMC Global | $56,483.25 |
| 8/8/14 | UPMC Global Service | $57,483.25 |

42. On or about September 9, 2014, eight UPMC Global Service checks worth $430,631.15 were deposited into the Health Ministry bank account at a Bank of America branch located in Washington D.C. This money appears to be an attempt to return the money that was previously embezzled from the Health Ministry. The checks numbers are sequential and range from 1001 to 1008. The memo line on the checks reads "Refund." Each of the checks was dated August 31, 2014. The checks appear to be signed by UCC-5. This deposit appears to be the same deposit described by UCC-2 in UCC-2's written statement which was provided to SI-1.

## VI.  CONCLUSION

43. Based on the above described facts, there is probable cause to believe that Kassem knowingly conspired with individuals employed by the Kuwaiti Health Ministry in Washington,

19

D.C. as well as other individuals known and unknown to violate of Title 18, United States Code, Section 1956(h). Specifically, Kassem and other individuals knowingly conducted financial transactions with property representing the proceeds of the specified unlawful activities of bank fraud (18 U.S.C. § 1344(2)) and wire fraud (18 U.S.C. § 1343) knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity in violation of 1956(a)(1)(B)(i) and that the criminally derived property involved in several transactions was of a value greater than $10,000 and was derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

_____
Brendan M. Shelley, Special Agent
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Homeland Security Investigations

Sworn to and subscribed to before me
this\_\_\_\_\_ day of March, 2015